**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION


TREMAR HARRIS,                      )

            Plaintiff,              )      Civil Action

vs.                                 )      No. 2:24-CV-9

OFFICER WILLIAM RENTZ,              )
individually, OFFICER JOHN
DOE 1-3, individually,              )

            Defendant.              )
_____

DEPOSITION OF

TREMAR HARRIS


Taken June 28, 2024, at 10:52 a.m.


Appling ITF
252 West Park Drive
Baxley, Georgia 31513


Janell A. Buchanan, Certified Court Reporter, B-1914

**Gilbert & Jones**
Certified Court Reporters

P. O. Box 1894 (31521)          gilbertandjones1@gmail.com          P. O. Box 14515 (31416)
1607 Norwich Street                   912.264.1670                  7505 Waters Avenue, F3
Brunswick, GA 31520                                                 Savannah, GA 31406

2

1                      APPEARANCES OF COUNSEL

2

3      On behalf of the Plaintiff:

4           CRYSTAL CAREY, Esq.
            Law Offices of Harry M. Daniels
5           4751 Best Road
            Suite 490
6           Atlanta, Georgia 30337
            (678) 664-8529
7           carey@harrymdaniels.com

8

9

10     On behalf of Defendant Rentz:

11          BEN T. TUTEN, Esq.
            Oliver Maner LLP
12          Post Office Box 10186
            Savannah, Georgia 31412
13          (912) 236-3311
            btuten@olivermaner.com
14

15

16

17

18

19     ALSO PRESENT:

20          HUGH J. McCULLOUGH

21          WILLIAM RENTZ

22

23

24

25

24

1    I just couldn't prove my innocence, though.

2         Q.    Did you -- did you go to trial on that

3    case?

4         A.    No, sir.

5         Q.    Pled guilty?

6         A.    Um-hum (affirmative).

7         Q.    Okay.  For all these arrests, besides the

8    March 2023, were you taken to the Appling County

9    Jail?

10        A.    Yes, sir.

11        Q.    Okay.

12        A.    But the last one they shipped me to Jeff

13   Davis.

14        Q.    Okay.

15        A.    This time here.

16        Q.    But for the 17 others you went to Appling

17   County?

18        A.    Yeah.

19        Q.    So that's at least 17 times that you were

20   in the Appling County Jail for about a 20-year

21   period.  Is that about right?

22        A.    Huh?

23        Q.    Over a 20-year period --

24        A.    Oh.

25        Q.    -- you were in Appling County Jail

1    approximately 17 times?

2         A.    I guess so; yes, sir.

3         Q.    For those stints that you had in the

4    Appling County Jail, could you tell me how long on

5    average you were in the jail for?

6         A.    I can't remember, really, to tell you the

7    truth.

8         Q.    Would it be more than three days?

9         A.    Oh, yes, sir.  Yeah.

10        Q.    More than a month?

11        A.    Maybe a couple of weeks.  It's going on

12   what kind of charge I had.

13        Q.    So, on average, maybe a couple of weeks?

14        A.    Yeah.

15        Q.    Each time you were arrested?

16        A.    Um-hum (affirmative).

17        Q.    Besides the grievance that you filed

18   related to this lawsuit, have you filed any other

19   grievances during your stints in the Appling County

20   Jail?

21        A.    No.

22        Q.    That's the only one?

23        A.    Yeah.

24        Q.    During these stints when you were in the

25   Appling County Jail, did you get to know Mr. Rentz?

1     A.    I knew of him but I didn't know him like

2  that.

3     Q.    Okay.  How would you interact with him?

4     A.    We didn't really.

5     Q.    You didn't interact at all?

6     A.    Not really.  Speak, and keep going.

7     Q.    Okay.  When -- well, let's just take

8  January 2022, when you were in Appling County Jail

9  then.

10    A.    Um-hum (affirmative).

11    Q.    Did you know Mr. Rentz better than the

12 other jailers that were there at the time?

13    A.    Not really.

14    Q.    No?

15    A.    No.

16    Q.    Before January 29th, 2022, did you have

17 any encounters with Mr. Rentz where you felt like he

18 meant to do you harm?

19    A.    Do what now?

20    Q.    Before January 29th, 2022, did you have

21 any encounters with Mr. Rentz --

22    A.    No.

23    Q.    -- where you felt like he meant to harm

24 you?

25    A.    No, sir.

1          Q.    Before January 29th, 2022, did you have

2    any encounters with Mr. Rentz where you felt like he

3    did not like you?

4          A.    No, sir.

5          Q.    All right.  Let's talk about the events

6    that gave rise to your lawsuit, all right?  You were

7    arrested on January 27th, 2022, for the possession of

8    drug-related objects; right?

9          A.    Yes, sir.

10         Q.    I'm going to give you what we will mark as

11   Exhibit 2.

12               (Exhibit 2 was marked for identification.)

13         Q.    (By Mr. Tuten)  These are documents that

14   we produced to your attorneys in discovery.  It is a

15   copy of the incident report detailing your arrest on

16   January 27th, 2022.

17         A.    (Reviewing document.)

18         Q.    Have you ever seen this before?

19         A.    No, sir.

20         Q.    Okay.  I want you to look at the third

21   page.  This is a narrative of your arrest on January

22   27th of 2022 prepared by Investigator Brandon Carver,

23   who was with the Appling County Sheriff's Office at

24   that time.

25         A.    Um-hum (affirmative).

1          Q.     And he says:  On January 27th, 2022,

2    Investigator Carver responded to 209 V.P. Lynch

3    Road in reference to a male subject by the name of

4    Tremar Harris causing problems at this residence and

5    threatening to kill everybody.  Is that right?

6          A.     No.

7          Q.     209 V.P. Lynch Road was where your

8    girlfriend was living; right?

9          A.     Yeah.  Yes, sir.

10          Q.     What were you doing on Lynch Road that

11    day?

12          A.     I used to just go out there and stay with

13    her sometimes.

14          Q.     Okay.  And that's what you were doing that

15    day, you were staying with her?

16          A.     Yeah.

17          Q.     Or you had stayed with her the night

18    before?

19          A.     Yes, sir.

20          Q.     How long had y'all been dating by this

21    point?

22          A.     About three years.

23          Q.     Okay.  So do you remember what time of day

24    it was that the Sheriff's Office got called out

25    there?

1       A.      No.

2       Q.      Okay.  Do you remember which other

3  deputies besides Carver were there when you were

4  arrested on the 27th?

5       A.      I can't remember.

6       Q.      After they arrested you, did you -- after

7  they arrested you, did they take you straight to the

8  Appling County Jail?

9       A.      Yes, sir.

10      Q.      And you got booked into the jail that

11  morning; right?

12      A.      Yes, sir.

13      Q.      Okay.  During the booking process at the

14  jail you were put into a holding cell; right?

15      A.      Yes, sir.

16      Q.      And you threw the bed in that holding cell

17  against the wall, didn't you?

18      A.      Threw a bed?  No.

19      Q.      A bed or a mattress?

20      A.      No.

21      Q.      No?

22      A.      No.

23      Q.      You're aware that there are surveillance

24  cameras in the Appling County Jail; right?

25      A.      Yeah.

1      Q.    And you are aware that those cameras

2  record what happened in the jail at any given time;

3  right?

4      A.    Yeah.

5      Q.    All right.  Bear with me a little bit.

6          I'm going to show you some video footage

7  that we have.

8          MR. TUTEN:  Carey, this is Rentz 204.

9      Ms. Carey.  And the footage is going to start at

10     9:25 a.m. on January 27th, 2022.  And just for

11     the record, I'm going to mark that as Exhibit 3.

12          And I'll provide you with a copy of these.

13          (Exhibit 3 was marked for identification.)

14          MR. TUTEN:  I told you to bear with me.

15     It's a cumbersome process to get this video

16     loaded.

17          MS. CAREY:  If you need a break at any

18     time, just let us know.

19          THE WITNESS:  Okay.

20     Q.    (By Mr. Tuten)  All right, Mr. Rentz

21  (sic), this is not the cleanest -- the best sizing of

22  it.  Let me get over here so I can see.

23          I'm going to start playing this video for

24  you.  I want you to watch this upper right thumbnail,

25  okay?  Well, if it will actually play.  Give me one

37

1   second.

2           Let's go off the record for one second.

3           (Off the record.)

4           MR. TUTEN:  Let's go back on the record.

5       Q.    (By Mr. Tuten)  This is Rentz 204, which

6   we've marked as Exhibit 3.  We're going to start

7   playing at 9:25:31 a.m. on January 27th, 2022.

8           And, Mr. Harris, if you'll look at the top

9   right thumbnail.

10      A.    (Playing video.)

11      Q.    I stopped playing at 9:25:36 a.m.

12          Mr. Harris, would you agree that Exhibit 3

13  is a fair and accurate depiction of your actions in

14  the Appling County Jail on January 27th, 2022?

15      A.    Yes, sir.

16      Q.    Do you have any reason to believe that

17  this video is inaccurate?

18      A.    No, sir.

19      Q.    So let me ask you again.  Did you throw a

20  bed in the holding cell against the wall?

21      A.    Yes, sir.  A mat.  I didn't throw no bed.

22  A mat.

23      Q.    A mat?

24      A.    Yeah.

25      Q.    Why did you throw the mat?

38

1    A.    I can't remember.  That been so long ago.

2    Don't seem like that got nothing to do with what

3    we're talking about, though.

4    Q.    Once you were booked in, did they put you

5    in the seg cell right away?

6    A.    I can't remember.  I think so, yeah.

7    Q.    Do you remember being in the seg cell that

8    first day that you were in jail?

9    A.    In the padded cell or which cell you

10   talking about?

11   Q.    The padded cell.

12   A.    Yes, sir.

13   Q.    Okay.  Had you ever been in that cell

14   before?

15   A.    No, sir.

16   Q.    That was the first time you had been put

17   in there?

18   A.    Yes, sir.

19   Q.    Did you know that there was a surveillance

20   camera in there?

21   A.    Yes.

22   Q.    And you were aware that that camera

23   recorded what you did inside that cell?

24   A.    Yes, sir.

25   Q.    Once you were in the seg cell you started

39

1    trying to kick the door; right?

2         A.    Yes, sir.

3         Q.    And you did that for hours at a time?

4         A.    No, it wasn't no hours.

5         Q.    But it was for more -- it was on more than

6    one occasion?  Would you agree with that?

7         A.    Yeah.  Yes, sir.

8         Q.    Would you agree with me that you clogged

9    the toilet in that cell?

10        A.    Yes, sir.

11        Q.    And it flooded the cell?

12        A.    Yes, sir.

13        Q.    Why did you do that?

14        A.    Because I was mad.

15        Q.    Did you feel like you were being treated

16   unfairly by anybody at the jail?

17        A.    Yeah.

18        Q.    Why did you feel like you were being

19   treated unfairly at the jail?

20        A.    Because I was.

21        Q.    How were you being treated unfairly at the

22   jail when you first got booked in?

23        A.    Because they threw me in the padded cell

24   for no reason.

25        Q.    Okay.  After you flooded the cell you

1      tried to push the water out into the hallway; right?

2            A.    Yeah.

3            Q.    And you made threatening gestures towards

4      the camera in your cell; right?

5            A.    I don't remember all that.

6            Q.    Do you remember making a throat-slashing

7      gesture for the camera?

8            A.    No.

9            Q.    Do you remember flipping off the camera?

10           A.    Probably.  I don't know.  It's been so

11     long ago.  I don't see why that got anything to do

12     with him putting the chain around my neck, though, --

13           Q.    On January 28th, 2022, --

14           A.    -- no matter what I did.

15           Q.    -- the second day that you were in the

16     Appling County Jail, you split a mattress in half;

17     right?

18           A.    I did what?

19           Q.    You split a mattress or a bed or a pad up?

20           A.    I don't know.  I can't remember.

21           Q.    Do you have any reason to think that you

22     didn't?

23           A.    No.

24           Q.    If there's video footage of you doing it,

25     would you have any reason to think that video footage

41

1   is not accurate?

2        A.    No.

3        Q.    Do you remember being placed in the

4   restraint chair for ripping the mattress?

5        A.    I remember being placed in the chair.

6        Q.    Okay.  So do you remember --

7        A.    I can't remember what they put me in the

8   chair for.

9        Q.    So you remember being placed in the chair?

10       A.    Yeah.

11       Q.    Was that on the second day you were in the

12  jail?  Was that the first time you were put in the

13  restraint chair?

14       A.    Yes, sir.

15       Q.    Okay.  And do you know how long you were

16  in the restraint chair for?

17       A.    Probably over two hours.

18       Q.    Okay.  I'm going to show you Rentz 240,

19  which we're going to mark as Exhibit 4 for the

20  record.  That means I've got to change flash drives,

21  though.

22            (Exhibit 4 was marked for identification.)

23       Q.    (By Mr. Tuten)  And I'm going to represent

24  to you, Mr. Harris, that what Rentz 240 is is 24

25  hours' worth of surveillance footage from the cell

1    surveillance camera in your cell?

2         A.    I can't remember.  I can't remember.

3         Q.    Were you put back in the restraint chair

4    after that?

5         A.    I believe so.

6         Q.    That afternoon you ripped up the mattress

7    in your cell again; right?

8         A.    I can't remember.

9         Q.    But if there's surveillance footage

10   showing that you did, you have no reason to dispute

11   that?

12        A.    No, sir.

13        Q.    Do you remember ripping apart your

14   jumpsuit and being put in a suicide smock?

15        A.    No, sir.

16        Q.    Okay.  But you have no reason to dispute

17   that that happened if there's surveillance footage

18   depicting it?

19        A.    No.

20        Q.    And you would not ever suggest that the

21   person in these videos is not you; correct?

22        A.    No.  That's me.

23        Q.    That's you?

24        A.    Yeah, that's me.

25        Q.    Okay.  So after you were put into the

47

1    restraint chair for the second time, do you know

2    approximately how long you were in there for?

3        A.    Not really.

4        Q.    Okay.  I'm going to show you Rentz 209,

5    starting at 4:02 p.m. on January 29th, 2022.  And

6    we'll mark that for the record as Exhibit 6.

7              (Exhibit 6 was marked for identification.)

8        Q.    (By Mr. Tuten)  I'm going to start

9    playing.

10             (Playing video.)

11             Do you know who that jailer holding the

12   shock shield is?

13       A.    I can't see him.  I believe it was Rentz,

14   though.

15       Q.    You believe that this is Rentz?

16       A.    I know he had at one time.  I don't know

17   -- I don't know if that was him or not.  Oh, no.

18   That ain't Rentz.

19       Q.    That's not Rentz?

20       A.    I don't think so.  I can't hardly tell,

21   really.  I don't think that's him, though.

22       Q.    Okay.  Do you know if it's the same jailer

23   that was putting you in the restraint chair the day

24   before when you pushed your leg out at him?

25       A.    I don't know.  I can't really remember,

48

1    man.

2        Q.    Okay.  And do you have any reason to

3    believe that this video does not accurately depict

4    what happened?

5        A.    No.

6        Q.    Okay.  We're going to go back to Exhibit

7    5, Rentz 211, and we're going to start at 4:23:40

8    p.m.

9    on January 29th, 2022.

10              MR. McCULLOUGH:  What time.

11              MR. TUTEN:  4:23:40.  Well, yes, 4:23:40.

12              MR. McCULLOUGH:  P.M.

13              MR. TUTEN:  P.M.

14              MR. McCULLOUGH:  Rentz 211.

15              MR. TUTEN:  Um-hum (affirmative).  Rentz

16        211.

17        Q.    (By Mr. Tuten)  I'm going to press "Play."

18              (Playing video.)

19              That's the second time that you smeared

20    feces on the surveillance camera in the cell; right?

21        A.    Yes.

22        Q.    And you have no reason to believe that

23    that is not you in the video?

24        A.    No.

25        Q.    Do you have any explanation for why you

49

1    did it a second time?

2         A.    No.

3         Q.    All right.  This is still on Rentz 211.

4    I'm going to drum forward to 4:40:30 p.m.

5              (Playing video.)

6              Is this a fair and accurate representation

7    of what happened --

8         A.    Um-hum (affirmative).

9         Q.    -- in that cell?

10        A.    Yes.

11        Q.    Are you able to better identify who the

12   jailer holding the shock shield is now?

13        A.    (Shakes head negatively.)

14        Q.    Could you agree that it is not Mr. Rentz?

15        A.    I couldn't hardly see.  Can you rewind it

16   back?

17        Q.    Sure.

18             (Playing video.)

19        A.    I can't see.  He's got on a mask.

20        Q.    So you can't say one way or the other?

21        A.    No, I can't say who that is.  He got a

22   mask on.

23        Q.    Do you have any reason to believe that

24   it's a different jailer than was holding the shock

25   shield at 4:02 p.m.?

50

1    A.    I don't know.  I couldn't say.

2    Q.    Okay.

3    A.    I can hardly see the video.

4    Q.    So I just want you to assume with me

5  that it's the same jailer that was holding the shock

6  shield then as holding the shock shield in the

7  hallway and who you moved your leg out against when

8  they were putting you in the restraint chair the day

9  before.  The same guy all three times.  That's the

10  third time in two days that you had some kind of

11  physical encounter with that jailer; right?

12    A.    Yeah.

13    Q.    But not any of the other jailers?

14    A.    Unh-unh (negative).  I don't think so.

15    Q.    Just that one guy?

16    A.    I guess so.

17    Q.    Do you have any idea why that one jailer

18  you were having issues with?

19    A.    No, I don't.

20    Q.    Did you have any issue with him that was

21  causing you to act aggressive towards him?

22    A.    No.

23          MR. TUTEN:  Okay.  Why don't we take a

24     five-minute break and we can finish up.

25          (Off record from 11:43 a.m. to 11:47 a.m.)

1            MR. TUTEN:  We can go back on the record.

2       Q.    (By Mr. Tuten)  All right.  So I think

3   where we left off is around 4:40 you had this

4   incident with the jailers where you had sprayed

5   cleaning supplies at them; right?

6       A.    Um-hum (affirmative).

7       Q.    And at that point they decided to put you

8   back in the restraint chair again.  Is that --

9       A.    I think so.

10      Q.    Is that your recollection?

11      A.    Yes, sir, I think so.

12      Q.    Okay.  So they put you in the restraint

13  chair.  And this is the third time you had been in

14  the restraint chair; right?

15      A.    I -- I'm not sure.  I think so.

16      Q.    Okay.  Do you remember being in it more

17  than three times?

18      A.    I don't think so.

19      Q.    Okay.  So when you were placed in the

20  restraint chair on this instance you managed to pull

21  your hands out of the straps for your hands; right?

22      A.    Um-hum (affirmative).

23      Q.    And you would agree with me that Mr. Rentz

24  and several of the other jailers went back into your

25  cell, put your hands into the straps, and then left;

52

1    right?

2         A.    Um-hum (affirmative).

3         Q.    Okay.  I'm going to show you Rentz 49,

4    which is from the same camera.  This is an easier to

5    watch video.

6              We're going to mark this as Exhibit 7, for

7    the record, and I'm going to start this --

8              MR. McCULLOUGH:  Rentz what?

9              MR. TUTEN:  Rentz 49.

10             MR. McCULLOUGH:  49.

11             MR. TUTEN:  49.

12             (Exhibit 7 was marked for identification.)

13        Q.    (By Mr. Tuten)  I'm going to start this at

14   the 40-second mark, which I will represent to you is

15   just after Mr. Rentz and the other jailers have left

16   your cell, having secured your hands to the restraint

17   chair.

18             (Playing video.)

19             Is Exhibit 7 a true and accurate depiction

20   of what occurred in your cell at the Appling County

21   Jail on January 29th, 2022?

22        A.    Yes.

23        Q.    And does Exhibit 7 depict the events that

24   you're complaining of in this lawsuit?

25        A.    Yes.

1    Q.    Is there any other event that you're

2  complaining of in this lawsuit that is not depicted

3  in Exhibit 7?

4    A.    No, sir.

5    Q.    You contend that Mr. Rentz said something

6  to you while this was going on; right?

7    A.    Yes, sir.

8    Q.    What comment did Mr. Rentz make that you

9  are complaining of in this lawsuit?

10    A.    He said he was going to send me back in

11  the field with the other boys, and that that was his

12  jail, and I think that's it.

13    Q.    Where during Exhibit 7 do you contend that

14  Mr. Rentz made that comment to you?

15    A.    When he bent down in front of me.

16    Q.    Okay.  So at the three-minute and

17  33-second mark?

18    A.    Um-hum (affirmative).

19    Q.    That's when you contend that Mr. Rentz

20  made that comment to you?

21    A.    Um-hum (affirmative).

22    Q.    Would you agree with me Mr. Rentz is

23  wearing a different jacket and a different hat than

24  the other jailers in the room?

25    A.    Yes, sir.

1      Q.     So knowing that, would you agree with me

2  that Mr. Rentz was not the officer holding the shock

3  shield in the previous clips we've watched?

4      A.     I mean, he could have changed hats, but,

5  yeah, I guess so.

6      Q.     Okay.  Is it possible that you misheard

7  the comment Mr. Rentz made to you?

8      A.     No.

9      Q.     Is it possible that someone else made the

10  comment?

11      A.     No.

12      Q.     Do you contend that Mr. Rentz made any

13  other offensive comments to you?

14      A.     No.  That was it.

15      Q.     During the 20 or so years that you had

16  spent time in the Appling County Jail you had run

17  across Mr. Rentz before; right?

18      A.     I think so.

19      Q.     Had he ever made a comment like that to

20  you before?

21      A.     No.  That's why I don't know why he did

22  that.  He -- I ain't never had no problem with him.

23      Q.     You never had any problems with him?

24      A.     No.  Not until then.

25      Q.     Would you say you had an okay relationship

55

1    with him?

2         A.    We didn't have no relationship because I

3    didn't know him like that.

4         Q.    Okay.  But you didn't have any problems

5    with him?

6         A.    No.

7         Q.    So what do you think would make Mr. Rentz

8    make a comment like that?

9         A.    I have no idea.  Because I'm black.

10        Q.    Besides the events that gave rise to this

11   lawsuit, do you have any quarrel with Mr. Rentz?

12        A.    No.

13        Q.    Have you ever seen Mr. Rentz treat another

14   black prisoner differently than a white prisoner?

15        A.    No.  Not until that day.

16        Q.    So your experience is the only experience

17   you have to base that off of?

18        A.    I guess so.

19        Q.    Do you know how Mr. Rentz treats other

20   prisoners?

21        A.    I don't.

22        Q.    So you can't say one way or the other if

23   he treats people differently based on their race?

24        A.    I can't.

25        Q.    You did not suffer any physical injuries

56

1  as a result of this incident, did you?

2       A.    No, sir.

3       Q.    You didn't seek any --

4       A.    I couldn't breathe.  I couldn't breathe.

5       Q.    But you didn't seek any medical treatment?

6       A.    They didn't give me any.

7       Q.    Did you ask for any?

8       A.    No, sir.

9       Q.    Did you have any kind of soreness in your

10  neck?

11      A.    A little bit.

12      Q.    But that went away on its own?

13      A.    Yes, sir.

14      Q.    In less than a day?

15      A.    A few days.

16      Q.    Okay.  Did you ever complain about being

17  in pain to anyone at the jail?

18      A.    I had done got out by then.

19      Q.    Okay.  When did you get out after this

20  happened?

21      A.    I think they -- I think I went to Georgia

22  Regional.  That's where I went.

23      Q.    Okay.  After you got out of Appling County

24  Jail?

25      A.    Um-hum (affirmative).

57

1          Q.    Did you get discharged this same day?

2          A.    I don't think so.  I can't remember.  I

3    don't think so, though, no.

4          Q.    But shortly thereafter?

5          A.    Um-hum (affirmative).

6          Q.    Given the video that we've watched, could

7    you agree with me that Mr. Rentz did not use a shock

8    shield on you?

9          A.    Use a shock shield?

10         Q.    Yes.

11         A.    Yes.

12         Q.    Yes, he did or, no, he did not?

13         A.    He didn't.

14         Q.    He did not use a shock shield?

15         A.    (Shakes head negatively.)

16         Q.    Okay.  And he certainly didn't use a shock

17   shield on you that day?

18         A.    (Shakes head negatively.)

19         Q.    Okay.  Make sure you give a yes or no

20   answer, Mr. Harris, so that the court reporter can

21   pick it up, but you're doing a good job with it.

22               I am going to show you what we will mark

23   as Exhibit 8, if I can find my pen.

24               Can I borrow your pen?

25               MR. McCULLOUGH:  Go right ahead.

1          MR. TUTEN:  I'll give you that back.

2          (Exhibit 8 was marked for identification.)

3      Q.   (By Mr. Tuten)  This is the Complaint that

4  you filed in the Southern District of Georgia, and I

5  specifically want you to look at Page 3, Paragraph 10

6  and 11.

7      A.   (Reviewing document.)

8      Q.   Have you read this document before,

9  Mr. Harris?

10     A.   No, sir.

11     Q.   Okay.  Paragraph 10 reads:  After lunch on

12 January 29th, Defendant Corrections Officer William

13 Rentz and Defendant Corrections Officers John Does

14 entered plaintiff's cell with a shock shield - an

15 electrified shield designed to deliver an electric

16 shock to those who come into contact with it.

17          Paragraph 11:  In using the shock shield,

18 Defendants Rentz and John Does delivered several

19 shocks to plaintiff.

20          Could you agree with me now, having been

21 through this deposition and having to watch this

22 footage, that Mr. Rentz did not use a shock shield on

23 you?

24     A.   I guess not.

25     Q.   So what you've alleged in Paragraph 10 and

59

1    11, certainly in Paragraph 11, regarding Mr. Rentz is

2    not true; correct?

3         A.    I guess not.

4         Q.    Did you have any other interactions with

5    Mr. Rentz on January 29th after what happened in the

6    cell with you?

7         A.    I think -- I think he came back in later

8    and told me that -- after he told me, he said he was

9    just playing or something like that.

10        Q.    Okay.  He came back and told you he was

11   just playing?

12        A.    Yeah.

13        Q.    Okay.  Do you know about how long after

14   this happened that was?

15        A.    No.

16        Q.    Was that the only --

17        A.    It might have been right after.  I don't

18   know.

19        Q.    Maybe right after?

20        A.    Maybe.  I don't know.  I can't remember.

21        Q.    Okay.  Is that the only other interaction

22   you had with Mr. Rentz that day?

23        A.    Um-hum (affirmative).

24        Q.    Did you have any other interactions with

25   -- strike that.

1          Did you have any other interactions with

2   Mr. Rentz at all after the events that were depicted

3   in Exhibit 7 beyond the conversation you just told me

4   about?

5      A.    No, sir.

6      Q.    So you've not talked to him at all since

7   this happened beyond that one conversation?

8      A.    No.

9      Q.    Did you tell anyone at the jail about what

10  you contend happened between yourself and Mr. Rentz?

11     A.    I told Adam Bell.

12     Q.    Did you verbally tell Adam Bell?

13     A.    Yeah.

14     Q.    And was that in addition to writing a

15  grievance?

16     A.    That's -- I wrote a grievance.  That's how

17  I told him.

18     Q.    Okay.  So you wrote the grievance?  You

19  didn't tell him in person?  You didn't have a

20  conversation with him?

21     A.    Yeah, I had a conversation with him.

22     Q.    Okay.  Well, help me understand that then.

23  Because you have a written grievance; right?

24     A.    Yeah.  I -- I talked to him, too.

25     Q.    Okay.  So you talked to him and filed a

1   written grievance?

2          A.    Um-hum (affirmative).

3          Q.    Did you talk to anybody else in the jail

4   about this?

5          A.    No.

6          Q.    Any other correctional officers?

7          A.    No.

8          Q.    Or any of the other inmates?

9          A.    No.

10          Q.    Did you talk to anybody on the outside

11   about it?

12          A.    No.

13          Q.    Okay.  The grievance that you filed, did

14   you ever get a response from the jail to that

15   grievance?

16          A.    I think the GBIs came.  After they found

17   out I had done got choked in jail, they came.

18          Q.    The GBI came, you think?

19          A.    Yeah.

20          Q.    But the jail itself -- so Adam Bell or

21   anybody else never gave you a written response to

22   that grievance?

23          A.    Adam came back and talked to me, I think.

24          Q.    Adam came and talked to you about it?

25          A.    Um-hum (affirmative).

62

1       Q.    But he never gave you a piece of paper

2   saying a response to it?

3       A.    Unh-unh (negative).  They didn't give me

4   no paper or nothing like that.

5       Q.    Okay.  So you said you got out and went to

6   Georgia Regional; right?

7       A.    Um-hum (affirmative).

8       Q.    How -- how did that come about?

9       A.    I don't know.  They -- after I got

10  released they sent me straight there.  That's all I

11  know.

12      Q.    "They," being the Sheriff's Office?

13      A.    Um-hum (affirmative).

14      Q.    They arranged for you to go to Georgia

15  Regional?

16      A.    Um-hum (affirmative).

17      Q.    And that's in Savannah; right?

18      A.    Um-hum (affirmative).

19      Q.    How long were you at Georgia Regional for?

20      A.    I done been three different times.  I

21  can't remember.

22      Q.    Okay.  About how many times have you been

23  to Georgia Regional?

24      A.    Three.

25      Q.    Three?

64

1       A.      Well, ...

2       Q.      Would it be unusual for you to go to

3   Georgia Regional for such a short period of time?

4       A.      No, sir.

5       Q.      No?  You've been in there before for a day

6   or two?

7       A.      Yes.  The last time I stayed one day.

8       Q.      One day?

9       A.      Um-hum (affirmative).

10      Q.      When was the last time you went?

11      A.      I can't remember, but I was -- I was

12  incarcerated in Jeff Davis, though.

13      Q.      So it was after that 2023 conviction?

14      A.      Um-hum (affirmative).

15      Q.      Okay.  That you were sent out to Georgia

16  Regional?

17      A.      Um-hum (affirmative).

18      Q.      And what kind of treatment are you

19  receiving at Georgia Regional?

20      A.      For bipolar schizophrenic.

21      Q.      Have you been diagnosed as being bipolar

22  or schizophrenic?

23      A.      Um-hum (affirmative).

24      Q.      Who diagnosed you with that?

25      A.      Georgia Regional.

65

1      Q.    Okay.  Was that diagnosis made before
2  January 29th, 2022?
3      A.    I -- I can't remember.  I think so.
4      Q.    Georgia Regional is the one made the
5  diagnosis?
6      A.    Um-hum (affirmative).
7      Q.    Okay.  When you went to Georgia Regional
8  after this happened, was that the first time you had
9  been there?
10     A.    I want to say it was.
11     Q.    So that was the first time you --
12     A.    No, the second time.
13     Q.    That was the second time?
14     A.    The second time.
15     Q.    Okay.  So you had been to Georgia Regional
16  before?
17     A.    Um-hum (affirmative).
18     Q.    And were treated for the same thing,
19  bipolar disorder and schizophrenia?
20     A.    Um-hum (affirmative).
21     Q.    Do you know the name of the doctor or
22  the psychiatrist that you worked with at Georgia
23  Regional?
24     A.    No, sir.
25     Q.    Are you on any medication or were you

67

1        A.      Yes, sir.

2        Q.      And how does that manifest itself?

3        A.      I couldn't tell you.

4        Q.      If you're having a schizophrenic episode

5   or a bipolar episode, do you have recollection of

6   what you were doing when that's going on?

7        A.      Sometimes.

8        Q.      Sometimes?

9        A.      Um-hum (affirmative).

10        Q.      When you got put back -- okay.  Scratch --

11   strike that.

12              You get out of Appling County Jail on the

13   29th, you go to Georgia Regional, you get arrested

14   again on the 4th, you go back to the Appling County

15   Jail?

16        A.      Um-hum (affirmative).

17        Q.      And about how long were you there that

18   time?

19        A.      Well, they -- they booked me and they sent

20   me to Hazlehurst.  Jeff Davis Jail.

21        Q.      That's when they sent you to Jeff Davis?

22        A.      Um-hum (affirmative).

23        Q.      Okay.  And how long did you stay in Jeff

24   Davis for?

25        A.      I can't remember.  I want to say about two

68

1    weeks.

2          Q.    About two weeks, you said?

3          A.    That's what I want to say.

4          Q.    Okay.  And then you got out and then you

5    were arrested again in March of that year for

6    disorderly conduct in Baxley again?

7          A.    Um-hum (affirmative).

8          Q.    So was that the last -- so when you got

9    arrested on March 11th, 2022, did they take you to

10   the Appling County Jail then?

11         A.    Yes, but they took me to Hazlehurst.

12         Q.    They took you to Hazlehurst again?

13         A.    Um-hum (affirmative).

14         Q.    Do you know why they were taking you to

15   Hazlehurst instead of to the Appling County Jail?

16         A.    I think because of what happened between

17   me and Rentz.

18         Q.    So do you know about how long you were in

19   Jeff Davis Jail after that March 11th arrest?

20         A.    Unh-unh (negative).  I don't know how long

21   I was locked up.

22         Q.    Probably about the same amount of time?

23         A.    Probably.

24         Q.    A week or two?

25         A.    Probably.

69

1        Q.    Okay.  And that's the last time you were

2    arrested until March 2023?

3        A.    Um-hum (affirmative).

4        Q.    So you were on the street, it's fair to

5    say, probably between the end of March of '22 and

6    March of '23?

7        A.    Um-hum (affirmative).

8        Q.    Were you taking your prescription

9    medications you were supposed to be taking --

10        A.    Um-hum (affirmative).

11        Q.    -- at that point?

12        A.    Um-hum (affirmative).

13        Q.    And did the prescription medication help

14    with your bipolar and schizophrenic episodes?

15        A.    Yes.

16        Q.    When you appeared -- when you had your

17    first appearance for the January 27th arrest, did you

18    say anything about what you alleged happened with you

19    and Mr. Rentz to the judge?

20        A.    No.

21        Q.    Okay.  Were you contacted by the GBI as

22    part of their investigation?

23        A.    Um-hum (affirmative).

24        Q.    You were?

25        A.    Yeah.  They seen me before I got out of

70

```
1   jail.
2         Q.    So they came and talked with you while you
3   were still in there?
4         A.    Um-hum (affirmative).
5         Q.    Okay.  Are there any other mental
6   hospitals or places like Georgia Regional you've been
7   treated at?
8         A.    Nowhere but here.
9         Q.    Just here?
10        A.    ITF.
11        Q.    Go ahead.
12        A.    At this ITF.
13        Q.    So here you're being -- are you being
14  treated for the same thing?
15        A.    Yes, sir.
16        Q.    Have you ever been treated for drug abuse?
17        A.    No, sir.
18        Q.    Or alcohol abuse?
19        A.    No, sir.
20        Q.    Okay.  So it's just the mental --
21        A.    Um-hum (affirmative).
22        Q.    -- illness diagnosis that is your
23  treatment plan here?
24        A.    Um-hum (affirmative).
25        Q.    And what is your treatment plan here?
```

1      A.    They just give me medicine for it and I go

2  to group -- take classes.

3      Q.    Okay.  Did you ever talk with your family

4  about what happened between you and Mr. Rentz?

5      A.    Yeah.

6      Q.    Did you talk with anyone else outside of

7  your family?

8      A.    No, sir.

9            MR. TUTEN:  Let's take one more break and

10       then we can wrap up.

11            (Recess from 12:10 p.m. to 12:14 p.m.)

12            MR. TUTEN:  We can go back on the record.

13      Q.    (By Mr. Tuten)  Mr. Harris, you testified

14  earlier that you believed that Mr. Rentz made that

15  comment to you or treated you differently because you

16  were black; right?

17      A.    Um-hum (affirmative).

18      Q.    Can you give me any other examples of a

19  time where Mr. Rentz treated you differently because

20  you were black beyond what you've complained of in

21  this lawsuit?

22      A.    That was the first time I ever dealt with

23  him.

24      Q.    That's the first time you ever dealt with

25  him?

79

1    with the other boys.  When I told him I was going to

2    tell Mr. Adam Bell he said that he didn't care

3    because this was his jail.  I will take legal action,

4    I promise.  The jail will be sued."

5         Q.    Okay.  And this statement is -- was true

6    when you wrote it; correct?

7         A.    Um-hum (affirmative).

8         Q.    And you wouldn't lie on an official

9    statement, would you?

10        A.    No.

11        Q.    Okay.  And you filled this grievance out

12   shortly after the incident took place; correct?

13        A.    Yes, ma'am.

14        Q.    And you previously stated that you gave it

15   to Officer Adam Bell?

16        A.    Yes, ma'am.

17        Q.    Okay.  Is that normal procedure of how you

18   would file a grievance?

19        A.    Yes, ma'am.

20        Q.    Okay.  And I've just got one additional

21   question.  At what time after the incident were you

22   released from Appling County Jail?

23        A.    I can't really remember.  I can't

24   remember.

25        Q.    Okay.  Could you say it was a few days or

1    was it a few weeks?

2         A.    A few days.

3              MS. CAREY:  Okay.  I have no further

4         questions.

5              MR. TUTEN:  I've got maybe three

6         follow-ups.

7              MS. CAREY:  Okay.

8                        EXAMINATION

9    BY MR. TUTEN:

10        Q.    Still looking at Plaintiff's Exhibit 1,

11   you signed it at the bottom.  This is your signature,

12   right, where it says "Inmate's Signature"?

13        A.    Um-hum (affirmative).

14        Q.    And the date says:  Question mark,

15   question mark, question mark; right?

16        A.    Um-hum (affirmative).

17        Q.    Do you know what day you actually filed

18   this grievance?

19        A.    I don't.

20        Q.    You say in your grievance that, "When I

21   told him I was going to tell Adam Bell he said that

22   he didn't care because this was his jail."

23              Is it your -- so you testified previously

24   that Mr. Rentz made this comment to you when he was

25   leaning over.  The one about putting you back in the

1    cotton fields; right?

2         A.    Um-hum (affirmative).

3         Q.    Did this exchange about you were going to

4    tell Adam Bell and he said he didn't care because he

5    runs this jail, did that happen at the exact same

6    time?

7         A.    I think so.

8         Q.    Okay.  So that happened while he was

9    leaned over with you?  That entire exchange?

10        A.    Um-hum (affirmative).

11              MR. TUTEN:  Okay.  I have no further

12        questions.

13              MS. CAREY:  I do not.

14              Let me have one.  One additional question.

15                         EXAMINATION

16    BY MS. CAREY:

17        Q.    Do you keep up with time in jail, as far

18    as dates?

19        A.    Not -- not really.

20        Q.    Okay.  So you would not have known --

21    well, let me scratch that.  Strike that.

22              How long did you stay in the cell after

23    the choking?  The isolated cell.

24        A.    I want to say until I left.  Was released.

25              MS. CAREY:  Okay.  I think that's -- I

83

1                CERTIFICATE OF COURT REPORTER

2

3      STATE OF GEORGIA:

4      COUNTY OF GLYNN:

5

6              I hereby certify that the foregoing
       transcript was reported as stated in the caption and
       the questions and answers thereto were reduced to
7      writing by me; that the foregoing Pages 1 through 82
       represent a true, correct, and complete transcript of
8      the evidence given on Friday, June 28, 2024, by the
       witness, TREMAR HARRIS, who was first duly sworn by
9      me.

10             I certify that I am not disqualified for a
       relationship of interest under O.C.G.A. 9-11-28(c);
11     I am a Georgia Certified Court Reporter here as an
       employee of Gilbert & Jones, Inc., who was contacted
12     by Oliver Maner, LLP, to provide court reporting
       services for the proceedings; I will not be taking
13     these proceedings under any contract that is
       prohibited by O.C.G.A. 15-14-37(a) and (b) or Article
14     7.C. of the Rules and Regulations of the Board; and
       by the attached disclosure form I confirm that
15     neither I nor Gilbert & Jones, Inc., are a party to a
       contract prohibited by O.C.G.A. 15-14-37(a) and (b)
16     or Article 7.C. of the Rules and Regulations of the
       Board.
17
               This 2nd day of July, 2024.
18

19

20                              *Janell A. Buchanan*

21                         _____
                           Janell A. Buchanan, Certified
22                         Court Reporter B-1914

23

24

25

GILBERT & JONES